IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

JUSTIN SHEKLETON,

        Plaintiff,

vs.

RYAN EICHENBERGER,
Individually and in his Official
Capacity as Law Enforcement Officer
for Chickasaw County Sheriff's
Department; and CHICKASAW
COUNTY, IOWA,

        Defendants.

No. C10-2051

RULING ON MOTION FOR
SUMMARY JUDGMENT

———————————

**TABLE OF CONTENTS**

*I.*    **INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*   **PROCEDURAL HISTORY**. . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*  **RELEVANT FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     *A.*   *The Parties*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     *B.*   *The Incident on September 6, 2008*. . . . . . . . . . . . . . . . . . 4

*IV.*  **LEGAL STANDARD FOR SUMMARY JUDGMENT**. . . . . . . . . . . . . . 11

*V.*   **DISCUSSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     *A.*   *Plaintiff's 42 U.S.C. § 1983 Action*. . . . . . . . . . . . . . . . . . 12
     *B.*   *Qualified Immunity*. . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     *C.*   *Is Deputy Eichenberger Entitled to Qualified Immunity
        from Shekleton's Claim Based Upon the Use of ExcessI've
        Force in Using His Taser?*. . . . . . . . . . . . . . . . . . . . . . 15
        *1.*   *Did Deputy Eichenberger Use Excessive Force When He
            Deployed His Taser Against Shekleton?*. . . . . . . . . . . 15
        *2.*   *Was the Right Clearly Established?*. . . . . . . . . . . . . 21
     *D.*   *Is There Sufficient Evidence that Chickasaw County
        Failed to Properly Train Its Deputy Sheriffs?*. . . . . . . . . . . 23

    *E.*    *Shekleton's State Law Claims*. . . . . . . . . . . . . . . . . . . . . . . . 25
        *1.*    *Assault and Battery*. . . . . . . . . . . . . . . . . . . . . . . . . 25
        *2.*    *Respondeat Superior*. . . . . . . . . . . . . . . . . . . . . . . . 26

*VI.*  *SUMMARY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*VII.*  *ORDER*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 13) filed by Defendants Ryan Eichenberger and Chickasaw County, Iowa, on February 11, 2011; the Resistance to Defendants' Motion for Summary Judgment (docket number 29) filed by Plaintiff Justin Shekleton on March 25, 2011; and the Reply (docket number 34) filed by Defendants on April 4, 2011. The parties' requests for oral argument are denied. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

## II. PROCEDURAL HISTORY

On July 14, 2010, Plaintiff Justin Shekleton filed a Petition at Law in the Iowa District Court for Chickasaw County. In the petition, Shekleton asserted a claim under 42 U.S.C. § 1983 against Defendant Ryan Eichenberger for violation of his constitutional rights under the Fourth Amendment to the United States Constitution. Shekleton also asserted a state law claim of assault and battery against Eichenberger, and a claim against Defendant Chickasaw County on a theory of respondeat superior.

On August 5, 2010, Defendants filed a Notice of Removal, removing this case from the Iowa District Court for Chickasaw County to this Court based on original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1441(b). On August 12, 2010, Defendants filed an Answer and Affirmative Defenses (docket number 5) denying the material allegations in Shekleton's petition and asserting certain affirmative defenses.

On March 2, 2011, Shekleton filed an Amended Complaint, for purposes of adding a claim under 42 U.S.C. § 1983 against Chickasaw County for violation of his

constitutional rights under the Fourth Amendment to the United States Constitution. On March 17, 2011, Defendants filed an Answer to Plaintiff's First Amended Complaint.

On September 23, 2010, both parties consented to proceed before a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). A jury trial is scheduled before the undersigned on October 17, 2011. Defendants timely filed the instant Motion for Summary Judgment (docket number 13) on February 11, 2011.

## III. RELEVANT FACTS

### A. The Parties

Plaintiff Justin Shekleton was born in 1979, and has lived in New Hampton, Iowa, since 1997. Shekleton owns and operates B&G Motors, a used car lot. In 1998, Shekleton was involved in a hunting accident which, among other things, caused a brain injury. As a result, Shekleton suffers from left-side dystonia; i.e, tremors.[1]

---

[1] *See* Shekleton's Statement of Additional Material Facts (docket number 29-2) at 1-2; ¶ 4 ("As a result, [Shekleton] suffers from a left-side dystonia which has gotten progressively worse since the hunting accident. In other words, [Shekleton's] left arm shakes all the time and it shakes 'real bad.'"). In their Reply to Plaintiff's Additional Material Facts (docket number 32), Defendants object to ¶ 4, because Shekleton failed to comply with Local Rule 56.b.4. Specifically, Local Rule 56.b.4 provides in pertinent part:

> Each individual statement of additional material fact must be concise, numbered separately, and supported by reference to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the statement, with citations to the appendix containing that part of the record.

*Id.* Here, instead of citing to the proper appendix, Shekleton simply cited to deposition pages and affidavits. Defendants also point out that some of the deposition pages cited by Shekleton are not contained in either Defendants' appendix or Shekleton's appendix. Defendants concede, however, that in his deposition, Shekleton testified that he had left-side dystonia and tremors. *See* Shekleton's Appendix (docket number 29-3) at 4; *see also id.* at 8 (deposition testimony from Shekleton describing his left arm tremors as a "real bad" shake that occurs "all the time.").

(continued...)

Defendant Ryan Eichenberger is a Chickasaw County, Iowa, deputy sheriff. He began working at the Chickasaw County Sheriff's office in 2002. He has been a law enforcement officer since 2000. Defendant Chickasaw County, Iowa, is municipal corporation incorporated under the laws of the state of Iowa.

### B. The Incident on September 6, 2008

On September 6, 2008, at around 5:00 p.m., Shekleton had one beer with two individuals at his used car lot. At around 7:00 p.m., Shekleton left work and drove to the Alley, a bar in New Hampton. At the Alley, Shekleton ordered one beer, and drank approximately three-fourths of it. At around 7:30 p.m., Shekleton left the Alley and walked one and one-half blocks to McShanny's Bar ("McShanny's").

At McShanny's, Shekleton played pool and drank three beers. He left McShanny's around 11:30 p.m. According to Shekleton, he had not finished his third beer when he left for the evening. Outside McShanny's, Shekleton saw Joy Brummond, Randy Brummond, John Schoenfeld, and Pamela Rausch smoking cigarettes. According to Shekleton, he engaged in a short conversation with Rausch.

Some time between 11:30 p.m. and 12:00 a.m., Deputy Eichenberger made a short stop at the Chickasaw County Sheriff's Office in New Hampton, and then resumed his regular patrol. While on patrol, Eichenberger drove past McShanny's. Eichenberger had the driver's side window of his patrol car rolled down, and both observed and heard a man

---

[1](...continued)

Defendants offer the same objection to virtually every paragraph of Shekleton's Statement of Additional Material Facts. *See* docket number 32. While the Court is sympathetic to the difficulties created by Shekleton's failure to comply with Local Rule 56.b.4, the Court will not strike Shekleton's statements of additional fact, unless otherwise addressed in this decision. The Court admonishes Shekleton, however, to carefully read the Local Rules and comply with them in the future; as failure to do so is annoying, creates additional work for the Court and the opposing party, and may result in adverse consequences.

and a woman arguing.[2]  Eichenberger believed that the woman was a bartender at McShanny's.

Shekleton denies, however, that he and Rausch were "engaged in a loud argument which was animated with a lot of body, head, and hand movement."[3]  In his Statement of Additional Material Facts, Shekleton states that he and Rausch:

> were engaged in a normal, friendly conversation.  They were laughing and having a good time.  Despite Defendant Eichenberger's contention, there was nothing about the conversation that resembled an argument, fight, or[] disagreement of any kind.

*See* docket number 29-2 at 3; ¶ 8.[4]  In support of his contention that he and Rausch were not arguing on September 6, 2008, Shekleton refers to his own deposition testimony where he states that he "just talked to [Rausch] and just had a regular conversation with

---

[2] The man and woman allegedly arguing were Shekleton and Rausch.

[3] *See* Shekleton's Response to Defendants' Statement of Undisputed Facts (docket number 29-1) at 3; ¶ 12.

[4] Defendants object to ¶ 8 of Shekleton's Statement of Additional Material Facts for the reasons previously noted, and dispute the factual allegations.  Specifically, Defendants deny Shekleton's description of the events because in his response to Defendants' statement of material facts, Shekleton admitted that Eichenberger 'believed he observed an animated conversation between a male and female in front of McShanny's . . .'"  *See* Defendants' Reply to Plaintiff's Additional Material Facts (docket number 32) at 4; ¶ 8.  The Court finds that Defendants' argument is without merit.  Shekleton's admission that Eichenberger "believed" he observed an argument between himself and Rausch is not an admission that an argument actually took place.  Similarly, Shekleton's admission that New Hampton Police Officers Robert Svec and Zachary Nosbisch heard Eichenberger say that he observed an argument in front of McShanny's over their police radios is not an admission that an argument actually took place.  *See* Defendants' Statement of Undisputed Material Fact (docket number 13-1) at 7; ¶ 14.

her[.] . . ."[5] Shekleton also refers to affidavits from Joy Brummond, Randy Brummond, and John Schoenfeld. In her affidavit, Joy Brummond states:

> On the evening of the incident, I observed [Shekleton] and [Rausch] talking out in front of McShanny's prior to Deputy Eichenberger's arrival. I was only three or four steps away from them and could hear the general nature of their conversation. It was a normal, friendly conversation. They might have been laughing a little loudly, but I did not observe any verbal fighting or arguing between the two.

*See* Shekleton's Appendix (docket number 29-3) at 45; Affidavit of Joy Brummond at ¶ 9. Similarly, Randy Brummond, in his affidavit, states:

> On the night in question, I observed a conversation between [Shekleton] and Ms. Rausch outside of McShanny's. We were all standing together out in front of the bar, having cigarettes when [Rausch] came outside and she and [Shekleton] started talking. It was a normal conversation. I was standing within a couple feet of them and they were just having a cigarette and chatting.

*See* Shekleton's Appendix (docket number 29-3) at 40; Affidavit of Lavern Randall Brummond at ¶ 10. Lastly, John Schoenfeld, in his affidavit, states:

> On the night of the incident, I observed [Shekleton] and Pam Rausch, another local acquaintance, having a conversation outside McShanny's. I was about ten feet away from the two of them. I did not hear the specifics of what they were talking about, but I could [] gauge the volume of their voices. I would describe the conversation as a regular, friendly conversation. I would definitely say that there was no argument, whatsoever.

*See* Shekleton's Appendix (docket number 29-3) at 35; Affidavit of John Schoenfeld at ¶ 10.

In any event, after observing what he believed to be an argument between Shekleton and Rausch, Deputy Eichenberger proceeded one block past McShanny's, turned his patrol

---

[5] *See* Defendants' Appendix (docket number 13-4) at 123; Shekleton's Deposition at 112:15-16.

car around in the parking lot of a gas station, and headed back toward McShanny's to investigate the perceived argument. Prior to arriving on the scene, Eichenberger also made two radio transmissions indicating that: (1) he observed an argument in front of McShanny's; and (2) he believed one of the people involved in the argument was a bartender at McShanny's. New Hampton Police Officers Robert Svec and Zachary Nosbisch heard Eichenberger's radio transmissions and responded to the scene.

Deputy Eichenberger parked his vehicle on Chestnut, a street around the corner from McShanny's.[6] Eichenberger exited his vehicle and walked toward Main Street. He met Shekleton walking toward him at the corner of Chestnut and Main. Eichenberger stopped Shekleton and asked him why he was arguing with Rausch in front of McShanny's. Shekleton responded that he was not arguing with anyone in front of McShanny's. Eichenberger again asked Shekleton why he was fighting with Rausch in front of McShanny's. Shekleton replied that he was not arguing with anyone, and suggested that Eichenberger go into McShanny's and ask Rausch if they had been fighting. Shekleton also asked Eichenberger to apologize for accusing him of arguing with Rausch. At this point, Officers Svec and Nosbisch arrived on the scene. Eichenberger directed them into McShanny's to ask the bartender what had been going on outside.

Believing that Shekleton was intoxicated, Deputy Eichenberger asked him to step away from the street corner, and Shekleton moved back toward McShanny's. Specifically, Shekleton leaned against the wall of a jewelry store next to McShanny's. Eichenberger again questioned Shekleton regarding the alleged argument with Rausch. According to

---

[6] McShanny's is located on the north side of Main Street in New Hampton, Iowa. A jewelry store is located at the northeast corner of Main Street and Chestnut. McShanny's is next to the jewelry store.

Eichenberger, Shekleton became agitated and told Eichenberger that he did not argue with Rausch, and that Eichenberger should "fucking apologize" to him.[7]

At this point, Shekleton stopped leaning against the wall, unfolded his arms, and turned toward Deputy Eichenberger. Perceiving Shekleton's change in posture as threatening, Eichenberger twice instructed Shekleton to place his hands behind his back. Both times, Shekleton responded that he was unable to place his left arm behind his back.[8]

---

[7] *See* Defendants' Statement of Undisputed Material Fact (docket number 13-1) at 13; ¶ 28 ("Eichenberger then told [Shekleton] that he could hear the argument from his squad car while passing by. Shekleton responded: 'You need to fucking apologize to me for accusing me of arguing.' Eichenberger responded by telling [Shekleton] to 'calm down.' Shekleton, more irritated, now told Eichenberger: 'You fucking apologize to me!'). Shekleton denies making such statements. *See* Shekleton's Response to Defendants' Statement of Undisputed Facts (docket number 29-1) at 5; ¶ 28. Specifically, Shekleton points to the Affidavits of John Schoenfeld, Randy Brummond, and Joy Brummond. In his affidavit, Schoenfeld stated that "I had not heard or noticed the specifics of the conversation between Deputy Eichenberger and [Shekleton], but also did not note any sort of heated argument or loud profanity" *See* Shekleton's Appendix (docket number 29-3) at 35; ¶ 13. Similarly, in Randy Brummond's affidavit, he stated that "I recall that [Shekleton] responded to Deputy Eichenberger's questions by asking him what he did wrong, and then stating that he hadn't done anything wrong. He started raising his voice throughout the encounter but it never reached the point where he was yelling or screaming at anyone. I don't remember him swearing at the officers." *Id.* at 40; ¶ 16. Lastly, Joy Brummond, in her affidavit, stated that "I do not remember [Shekleton] swearing or being belligerent towards any of the officers." *Id.* at 46; ¶ 14.

[8] *See* Defendants' Appendix (docket number 13-4) at 147; Shekleton's Deposition at 156:12-21. Specifically, Shekleton's deposition testimony provides:

> Q:    Okay. Now, let me ask you this sir: Do you remember Deputy Eichenberger asking you to place your hands behind your back?
> A:    Yes. But it was --
> Q:    I'm told -- Excuse me. I'll ask the next question. I'm told he did that twice and maybe three times. Do you remember how many times in your own recollection he asked you to do that?
> A:    Twice. And both times I told him I couldn't put my left

(continued...)

Deputy Eichenberger proceeded to attempt to handcuff Shekleton. The record is unclear as to what exactly transpired when Eichenberger attempted to handcuff Shekleton. In their Memorandum in Support of Motion for Summary Judgment, Defendants assert that "Eichenberger grabbed [Shekleton's] arm to place an arm bar on [him], preliminary to handcuffing, but [Shekleton] broke away from [] Deputy [Eichenberger's] grip, moving eastward back towards McShanny's front door, as Eichenberger yelled at [Shekleton] to stop resisting."[9] In his Amended Complaint, Shekleton describes the events as follows:

> [Deputy Eichenberger] proceeded to move towards [Shekleton] and place him in an arm bar. While [Eichenberger] attempted his maneuver, both parties fell toward the street. As both parties fell toward the street, [Eichenberger] lost his grip on [Shekleton's] arm.

See Shekleton's Amended Complaint (docket number 23) at 3-4; ¶¶ 16-17. In any event, Shekleton agreed in his deposition that Eichenberger's "grip broke away for whatever reason[.]"[10]

At the time when Deputy Eichenberger's attempt to restrain Shekleton failed, Officers Svec and Nosbisch were exiting McShanny's, and observed Shekleton and Eichenberger falling away from each other. Svec heard Eichenberger order Shekleton to stop resisting, and then grabbed Shekleton's left arm. Similar to Eichenberger, Svec was unable to restrain Shekleton.[11] When Svec stated that Shekleton was resisting,

_____

[8] (...continued)
> arm behind my back.

*Id.*

[9] *See* Defendants' Memorandum in Support of Motion for Summary Judgment (docket number 13-5) at 4-5.

[10] *See* Defendants' Appendix (docket number 13-4) at 153; Shekleton's Deposition at 162:21-25.

[11] Again, it is unclear from the record the exact nature of Officer Svec's attempt
(continued...)

Eichenberger unholstered his taser, yelled "Taser, taser, taser," and discharged the taser at Shekleton. The taser probes hit Shekleton in the upper chest and below his rib cage. An electrical pulse from the probes entered Shekleton's body, and caused him to fall face-first to the ground. Due to the fall, Shekleton suffered a minor injury to his head.

While Shekleton was on the ground, Officers Svec and Nosbisch double-handcuffed him.[12] Shekleton was arrested for public intoxication and interference with official acts. Prior to being booked on the public intoxication and interference with official acts charges, Shekleton was taken to the hospital for treatment of his injuries. The criminal charges against Shekleton were ultimately dismissed. Additional facts which are relevant to the issues will be set forth below.

---

[11](...continued)

to restrain Shekleton. According to Svec, Shekleton "turned forcefully away from me, breaking free and away from my grip . . . and knocking me off balance in the process." *See* Defendants' Appendix (docket number 13-3) at 65; Affidavit of Robert L. Svec. Similarly, in his affidavit, Officer Nosbisch states that he saw Shekleton "spin away from Officer Svec's hold on his arm and break loose from his grip." *Id.* at 71. According to Shekleton, however, his left arm "was experiencing one of its usual tremors, and Officer Svec did not have a strong hold of the arm. Furthermore, when someone grabs [Shekleton's] left arm and tries to pull it away an automatic resistance follows due to [Shekleton's] physical disability and affliction." *See* Shekleton's Memorandum of Authorities in Support of Plaintiff's Resistance to Defendants' Motion for Summary Judgment (docket number 28-1) at 8; *see also* Shekleton's Appendix (docket number 29-3) at 30; Shekleton's Deposition at 166:13-19 (Shekleton stated that "if you grab on to my left arm and you try to pull it away from me it -- it automatically resists no matter what. And when Svec grabbed on to it and pulled it back, it automatically pulls the other way because of my accident[.]").

[12] When someone is double-handcuffed, two sets of hand-cuffs are used in such a manner that one set is cuffed to one arm, and the other set is cuffed to the other, and both sets are cuffed together. This allows extra space for the arms being cuffed behind the back.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).[13] A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

---

[13] An amended version of FEDERAL RULE OF CIVIL PROCEDURE 56 became effective on December 1, 2010. However, "[t]he standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56 advisory committee's note.

## V. DISCUSSION

### A. Plaintiff's 42 U.S.C. § 1983 Action

In his amended complaint, Shekleton claims that Deputy Eichenberger violated his constitutional rights under the Fourth Amendment by employing excessive force in the use of a taser against him. Shekleton also claims that Chickasaw County failed to properly instruct and train its law enforcement officers in the proper and appropriate use of a taser against citizens. Shekleton seeks monetary damages against Defendants.

In determining whether a plaintiff is entitled to recover in a § 1983 action, the Court must determine whether he or she was deprived of a federal constitutional right by a person acting under color of state law.[14] Thus, the Court must address two elements:

> [I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *see also West v. Atkins*, 487 U.S. 42, 48 (1988) (same).

The first question posed by *Parratt* is easily dispatched. It is undisputed that Deputy Eichenberger was acting "under color of state law." *See* Shekleton's Amended Complaint (docket number 23) at 5; ¶ 26 ("At all times material hereto, [Deputy Eichenberger's] actions and/or omissions were made under the color of authority and law as a law enforcement officer for the Chickasaw County Sheriff's Department."); Defendants' Answer to Plaintiff's First Amended Complaint (docket number 25) at 5; ¶ 26 (admitting ¶ 26 of Shekleton's Amended Complaint); *see also West*, 487 U.S. at 49 ("The

---

[14] Section 1983 itself does not confer any substantive rights, "but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' *United States v. Classic*, 313 U.S. 299, 326 (1941)."). When Eichenberger used his taser against Shekleton, he was clothed with the authority of Chickasaw County, and acted in his official capacity as a deputy sheriff. Accordingly, Shekleton has established the first "essential element" of a § 1983 action; namely, that the conduct complained of was committed by a person acting under color of state law.

The second question posed by *Parratt* requires the plaintiff to identify the constitutional provision allegedly infringed. *Baker v. McCollan*, 443 U.S. 137, 142 (1979). Shekleton claims that his constitutional rights were violated under the Fourth Amendment when Deputy Eichenberger used his taser on Shekleton, constituting excessive force. Defendants do not appear to challenge Shekleton's identification of the Fourth Amendment as the constitutional provision allegedly infringed. Instead, Eichenberger argues that summary dismissal is appropriate because he is entitled to qualified immunity. Chickasaw County argues that it is also entitled to summary judgment on Shekleton's § 1983 claim, because the claim does not meet the requirements for liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

### B. Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Howard v. Kansas City Police Department*, 570 F.3d 984, 987-88 (8th Cir. 2009) ("'Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right

of which a reasonable person would have known.' *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006).").

A two-part inquiry is employed to determine whether a government official is entitled to qualified immunity. *Serna v. Goodno*, 567 F.3d 944, 951 (8th Cir. 2009). The two-part inquiry requires the Court to determine:

> (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the defendant's alleged misconduct.

*Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under *Saucier*, courts were mandated to follow a specific sequence of analysis for the two-part inquiry. *See Saucier*, 533 U.S. at 200-01. Specifically, the *Saucier* mandatory sequence of analysis required that:

> First, courts were to consider whether, 'taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right.' The 'existence or nonexistence of a constitutional right' was, therefore, a threshold question. Second, courts were 'to ask whether the right was clearly established.' This second question is a fact-intensive inquiry that 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' 'For a right to be deemed clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."' In other words, 'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.

*Serna*, 567 F.3d at 951-52 (quotations omitted). In *Pearson*, the Supreme Court eliminated the mandatory aspect of *Saucier*'s sequential analysis. *Id.* at 952; *see also Howard*, 570 F.3d at 988 ("Recently, however, the Supreme Court abandoned this rigid sequence and allowed judges 'to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand.'") (quoting *Pearson*, 129 S. Ct. at 818). In the present case, the Court elects to proceed under the traditional framework and decide first whether the facts demonstrate a violation of Shekleton's constitutional rights before determining whether such rights were clearly established.

### C. Is Deputy Eichenberger Entitled to Qualified Immunity from Shekleton's Claim Based Upon the Use of Excessive Force in Using His Taser?

### 1. Did Deputy Eichenberger Use Excessive Force When He Deployed His Taser Against Shekleton?

Shekleton argues that Deputy Eichenberger's use of a taser against him constitutes excessive force. Specifically, Shekleton argues that Eichenberger's use of the taser was unreasonable under the circumstances. Defendants argue that Eichenberger's use of the taser against Shekleton was not excessive, and Eichenberger is entitled to qualified immunity with regard to his use of the taser.

Excessive force claims are analyzed in the context of seizures under the Fourth Amendment. *Brown*, 574 F.3d at 496. "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right use some degree of physical coercion or threat thereof to effect it.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In order to establish a constitutional violation under the Fourth Amendment right to be free from excessive force, courts must consider "'whether the amount of force used was objectively reasonable under the particular circumstances.'" *Henderson*, 439 F.3d at 502 (quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004), in turn quoting *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994)); *see also Howard*, 570 F.3d at 989 ("The penultimate question is 'whether the amount of force used was objectively reasonable under the particular circumstances.'") (quotation omitted).

In *Howard*, the Eighth Circuit Court of Appeals explained that:

'Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' In assessing the reasonableness of the Officers' conduct, we look to the totality of the circumstances and focus on factors such as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. We may also consider the result of the force.

570 F.3d at 989 (quotations and citations omitted). Furthermore, courts must consider the reasonableness of a police officer's use of force "'from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Brown*, 574 F.3d at 496 (quoting *Graham*, 490 U.S. at 396).

The facts, considered in the light most favorable to Shekleton, *Serna*, 567 F.3d at 951, are: (1) Deputy Eichenberger stopped Shekleton on a street corner near McShanny's to inquire about an argument which Eichenberger believed he observed between Shekleton and Rausch; (2) Shekleton told Eichenberger several times that he did not engage in an argument with Rausch; (3) Eichenberger asked Shekleton to move away from the street corner and back toward McShanny's; (4) Shekleton complied and leaned against the wall of a building next to McShanny's; (5) Eichenberger continued to question Shekleton about the alleged argument; (6) at some point in the questioning, Shekleton stopped leaning against the building, unfolded his arms, and turned toward Eichenberger; (7) Eichenberger instructed Shekleton to place his arms behind his back; (8) Shekleton told Eichenberger that he was unable to put his left arm behind his back; (9) Eichenberger attempted to place Shekleton in an arm bar; (10) Eichenberger lost his grip on Shekleton's arm and instructed Shekleton to stop resisting; (11) Officer Svec observed Eichenberger lose his grip on Shekleton's arm, and heard Eichenberger order Shekleton to stop resisting; (12) Svec grabbed Shekleton's left arm and tried to restrain him; (13) Shekleton's left arm is disabled

and has involuntary tremors; (14) Svec lost his grip on Shekleton's left arm; (15) Eichenberger unholstered his taser, yelled "Taser, taser, taser," and fired the taser at Shekleton; (16) the taser probes entered Shekleton's body and caused him to fall face-first onto the ground; (17) Shekleton was placed under arrest for public intoxication and interference with official acts, both misdemeanors; and (18) after being tased, Shekleton did not resist being arrested and was double-handcuffed to make it easier for Shekleton to have his hands behind his back.

Additionally, in his affidavit, John Schoenfeld, described the events between Shekleton and Deputy Eichenberger as follows:

> I did not pay attention to the conversation [between Shekleton and Eichenberger] until I heard Deputy Eichenberger tell [Shekleton] to 'put your hands behind your back.' Prior to that comment, I had not heard or noticed the specifics of the conversation between Deputy Eichenberger and [Shekleton], but also did not note any sort of heated argument or loud profanity.
>
> I never observed any physical aggression between [Shekleton] and any of the officers. I never witnessed Deputy Eichenberger attempt to restrain [Shekleton]. . . . After a minute or two, I heard Deputy Eichenberger instruct [Shekleton] to put his arm behind his back. [Shekleton] told Deputy Eichenberger he was unable to do [so] due to the fac[t] that he lacks control of his arm. Deputy Eichenberger immediately screamed 'TASER! TASER! TASER!' and instantly shot the taser at [Shekleton], without giving [Shekleton] any time to respond or react.
>
> I did not see [Shekleton] take an aggressive stance or engage in any behavior that would remotely suggest he was going to act aggressively. [Shekleton] was trying to walk away from the situation, not attack the officers. It was the opposite of aggressive behavior.

*See* Shekleton's Appendix (docket number 29-3) at 35-36; Affidavit of John Schoenfeld at ¶¶ 13-15.

Similarly, Randy Brummond, in his affidavit, described the events between Shekleton and Deputy Eichenberger as follows:

> I first noticed the interaction between [Shekleton] and Deputy Eichenberger when I heard [Shekleton] ask the officer what he did wrong and why he was being stopped. . . .
>
> I recall that [Shekleton] responded to Deputy Eichenberger's questions by asking him what he did wrong, and then stating that he hadn't done anything wrong. He started raising his voice throughout the encounter but it never reached the point where he was yelling or screaming at anyone. I don't remember him swearing at the officers.
>
> I never saw [Shekleton] either physically resist the officers or behave in an abusive or belligerent manner towards them.
>
> I have witnessed the paralysis in [Shekleton's] arm on many occasions. He basically can't use his arm for anything more than holding things sometimes. His arm acts up all the time, and it was acting up that night and was visibly shaking.
>
> I heard the officers tell [Shekleton] to put his arm behind his back many times, and every time the officers tried to get [Shekleton] to put his arm behind his back, he told them that he couldn't put it back there.
>
> I never, at any point, saw [Shekleton] take an aggressive stance or act in any way that could be interpreted as trying to physically confront the officers. The only thing he ever tried to do was walk away and back into the bar.
>
> I am not sure if I saw Deputy Eichenberger try and restrain [Shekleton] or not. I did not notice any handcuffs until after [Shekleton] had been tased. At some point after Deputy Eichenberger and [Shekleton] first started talking, [Shekleton] asked why they were trying to arrest him, and eventually said 'I'm going back into the bar' and started walking away from the officers. At this point Deputy Eichenberger screamed

> 'TASER! TASER! TASER!' and instantly shot [Shekleton]
> with his taser.

*See* Shekleton's Appendix (docket number 29-3) at 40-41; Affidavit of Lavern Randall

Brummond at ¶¶ 13, 16-21.

Lastly, Joy Brummond, in her affidavit, described the events between Shekleton and

Deputy Eichenberger as follows:

> While [Shekleton] was outside speaking with Ms. Raus[c]h and
> Deputy Eichenberger, I observed his arm was visibly shaking.
> I know this is a common condition for [Shekleton] ever since
> he was shot years ago in a tragic hunting accident. I believe
> Deputy Eichenberger saw this tremor as well. He was trying
> to put [Shekleton's] arm behind his back. [Shekleton] notified
> Deputy Eichenberger that he could not put his arm behind his
> back and Deputy Eichenberger responded 'I know.'
>
> I do not remember [Shekleton] swearing or being belligerent
> towards any of the officers. He kept pleading with them
> 'please, please don't do this.' [Shekleton] seemed a little
> agitated that they were trying to restrain him for no reason, but
> that was the worst of it.
>
> I saw the officers try to handcuff [Shekleton] prior to his
> tasering. Based on my observations [Shekleton] most
> definitely did not physically resist the officer while they
> attempted to handcuff him.
> Based on my observations, [Shekleton] did not at any point
> engage in aggressive behavior or do anything that made me
> think he was going to physically confront the officers.

*See* Shekleton's Appendix (docket number 29-3) at 45-46; Affidavit of Joy Brummond at

¶¶ 13-16.

In assessing the reasonableness of Deputy Eichenberger's conduct, the Court

considers that:    (1) Shekleton's alleged crimes were very minor, two simple

19

misdemeanors; (2) Shekleton did not pose an immediate threat to the officers or others;[15] and (3) Shekleton did not struggle with officers, resist arrest, or attempt to escape.[16] *See Howard*, 570 F.3d at 989. Having considered these facts, the Court determines that under the circumstances presented, Deputy Eichenberger's use of force in using his taser against Shekleton was objectively unreasonable. *See Henderson*, 439 F.3d at 502. Accordingly,

---

[15] The Court acknowledges that Deputy Eichenberger perceived Shekleton's change in position from leaning against a wall to not leaning against the wall and facing him was threatening. However, in the affidavits of Schoenfeld, Randy Brummond, and Joy Brummond, all eye witnesses of the interaction between Shekleton and Eichenberger, each individual states that Shekleton did not act aggressively toward Eichenberger or the other law enforcement officers. *See* Shekleton's Appendix (docket number 29-3) at 36; Affidavit of John Schoenfeld at ¶ 15; *id*. at 41; Affidavit of Lavern Randall Brummond at ¶ 20; *id*. at 46; Affidavit of Joy Brummond at ¶ 16. Because this is Defendants' motion for summary judgment, the Court must view the record in the light most favorable to Shekleton and afford him all reasonable inferences. *See Baer Gallery, Inc.*, 450 F.3d at 820. Thus, for purposes of the above inquiry, the Court shall view the facts as though Shekleton was not aggressive or threatening toward the law enforcement officers. *See also Serna*, 567 F.3d at 951 (In the qualified immunity context, courts first, "consider whether, 'taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right.'") (Quotation omitted).

[16] Again, the Court acknowledges that both Deputy Eichenberger and Officer Svec claim that Shekleton resisted arrest when they tried to place him in an arm bar, but lost their grip on his arm. However, in the affidavits of Schoenfeld, Randy Brummond, and Joy Brummond, all eye witnesses of the interaction between Shekleton and Deputy the law enforcement officers, each individual states that Shekleton did not resist arrest. *See* Shekleton's Appendix (docket number 29-3) at 36; Affidavit of John Schoenfeld at ¶¶ 14-15; *id*. at 41; Affidavit of Lavern Randall Brummond at ¶¶ 17, 20; *id*. at 46; Affidavit of Joy Brummond at ¶¶ 15-16. Because this is Defendants' motion for summary judgment, the Court must view the record in the light most favorable to Shekleton and afford him all reasonable inferences. *See Baer Gallery, Inc.*, 450 F.3d at 820. Thus, for purposes of the above inquiry, the Court shall view the facts as though Shekleton did not resist arrest. *See also Serna*, 567 F.3d at 951 (In the qualified immunity context, courts first, "consider whether, 'taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right.'") (Quotation omitted).

the Court finds that Shekleton has alleged facts which, if believed, make out a violation of his constitutional rights under the Fourth Amendment. *See Brown*, 574 F.3d at 496.

### 2. *Was the Right Clearly Established?*

The next step in the qualified immunity analysis is the determination of "whether the right violated was clearly established." *Brown*, 574 F.3d at 499. "'The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202). The primary difference between the reasonableness inquiry at the second step of the qualified immunity analysis and the reasonableness inquiry at the first step of the qualified immunity analysis is that "'the right allegedly violated must be defined at the appropriate level of specificity before a court can determine whether it was clearly established.'" *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) (quoting *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005)). Accordingly, the Court must determine whether the facts alleged support a claim of a violation of Shekleton's clearly established Fourth Amendment rights such that "a reasonable officer would have fair warning that his alleged conduct was unlawful." *Brown*, 574 F.3d at 499. (citations omitted).

"'The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person.'" *Howard*, 570 F.3d at 991 (quoting *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)). In *Brown*, the Eighth Circuit Court of Appeals explained the right to be free from excessive force in the context of the use of a taser, as follows:

> it is clearly established that force is least justified against
> nonviolent misdemeanants who do not flee or actively resist
> arrest and pose little or no threat to the security of the officers
> or the public. At the time [the police officer] deployed his
> Taser and arrested [the plaintiff], the law was sufficiently clear
> to inform a reasonable officer that it was unlawful to Taser a
> nonviolent, suspected misdemeanant who was not fleeing or
> resisting arrest, who posed little to no threat to anyone's
> safety, and whose only noncompliance with the officer's

21

> commands was to disobey two orders to end her phone call to
> a 911 operator.

574 F.3d at 499. Viewing the facts in the light most favorable to the nonmoving party, Shekleton: (1) was a nonviolent suspected misdemeanant; (2) did not resist the arrest;[17] (3) did not struggle with officers or pose a threat to the officers;[18] and (4) did not attempt to flee. Furthermore, when asked to place his hands behind his back, Shekleton told Deputy Eichenberger, at least twice, that he could not place his left arm behind his back. In her affidavit, Joy Brummond states that Eichenberger acknowledged that Shekleton could not place his left arm behind his back.[19] Moreover, there were three law enforcement officers at the scene and Eichenberger provided no warning to Shekleton that he would use his taser on him if he did not cooperate.[20] Considering all the circumstances and accepting Shekleton's version of the facts as true, the Court concludes that Shekleton has alleged a violation of his clearly established right to be free from excessive force. *See id.* Therefore, the Court finds that Eichenberger is not entitled to summary judgment on

---

[17] *See* footnote 16.

[18] *See* footnote 15.

[19] *See* Shekleton's Appendix (docket number 29-3) at 45-46; Affidavit of Joy Brummond at ¶ 13.

[20] The fact that multiple officers were involved in this case, and Deputy Eichenberger did not warn Shekleton that he was going to use his taser on him, distinguishes this case from other cases in the Eighth Circuit. *See McKenney v. Harrison*, ___ F.3d ___, 2011 WL 1104528 (8th Cir. 2011) (use of a taser on individual did not violate the individual's constitutional rights when the individual attempted to flee and was warned that a taser would be used against him if he tried to flee); *Cook v. City of Bella Villa*, 582 F.3d 840 (8th Cir. 2009) (use of a taser on individual did not violate the individual's constitutional rights when the individual posed a threat to a single officer on a state highway at midnight); *Schumacher v. Halverson*, 467 F. Supp. 2d 939 (D. Minnesota 2006) (use of a taser on individual did not violate the individual's constitutional rights when the individual resisted arrest and was warned three times that a taser would be used against him if he did not stop resisting arrest).

Shekleton's § 1983 claim based upon the use of excessive force in deploying his taser against him. *See id.* at 500 ("It is the province of the jury to assess the credibility of the evidence, and if the jury accepts [the plaintiff's] account, it could fairly conclude that to apply a Taser in the situation here presented would constitute the use of excessive force.").

### D. Is There Sufficient Evidence that Chickasaw County Failed to Properly Train Its Deputy Sheriffs?

Municipal liability under § 1983 is established if the plaintiff shows that a "constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citing *Monell*, 436 U.S. at 690-92). Municipal liability attaches under two basic circumstances: (1) where a particular municipal policy or custom violates federal law, or the policy or custom directs an employee to violate federal law; and (2) where a lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Id.* (citing *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008)).

Shekleton argues that Defendant Chickasaw County failed to properly train Deputy Eichenberger on the use of a taser. Shekleton also argues that Chickasaw County failed to properly train Eichenberger in tactical alternatives to the use of a taser. Shekleton concludes that Chickasaw County's failure to properly train its deputy sheriffs constitutes deliberate indifference and thereby subjects the county to liability.

Plaintiff's argument focuses on the second circumstance under which municipal liability may attach. Specifically, "'the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). In *Otey v. Marshall*, 121 F.3d 1150 (8th Cir. 1997), the Eighth Circuit Court of Appeals further explained:

> It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In other words, the plaintiff must demonstrate that the city had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.

*Id.* at 1156 (quotations and citations omitted); *see also Moyle*, 571 F.3d at 818-19 ("The standard for deliberate indifference is objective; a governmental entity is liable if it has maintained 'a policy in which the inadequacy is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights' that the policymakers can be said to have been deliberately indifferent.") (Quotation omitted).

While Shekleton presents evidence, in the form of expert opinion evidence from Marshall "Rocky" Warren,[21] that Deputy Eichenberger had inadequate training and Chickasaw County's policies regarding the use of a taser were inadequate, Shekleton fails to present any evidence suggesting the Chickasaw County "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Otey*, 121 F.3d at 1156; *see also Moyle*, 571 F.3d at 819 ("Appellants have not offered any evidence that the county had notice of an alleged inadequacy in the . . . policy or that the policy's alleged inadequacy was so patently obvious that the county should have known that constitutional violation was inevitable."). The Court finds that without such facts to demonstrate that there is a genuine issue for trial, Shekleton's mere allegations that the Chickasaw County failed to adequately train its deputy sheriffs cannot defeat summary

---

[21] *See* Shekleton's Appendix (docket number 29-3) at 48-53 (Use of Force -- Police Procedures Evaluation by Marshall "Rocky" Warren, dated February 23, 2011). In its Brief in Reply to Plaintiff's Memorandum in Resistance to Motion for Summary Judgment (docket number 31-1), Defendants object to Mr. Warren's "professed" expert opinions and move to strike Warren's unsigned evaluation. *Id.* at 4-5. For the reasons set forth above, the Court finds it unnecessary to address Defendants' objections.

judgment. *See Baum*, 440 F.3d at 1022 ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."); *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) ("'Evidence, not contentions, avoids summary judgment.'") (Quotation omitted)). Therefore, the Court determines that Defendant Chickasaw County is entitled to summary judgment on Shekleton's § 1983 failure to train claim.

## E. *Shekleton's State Law Claims*

### 1. *Assault and Battery*

Defendants argue that if the Court grants summary judgment in their favor on Shekleton's § 1983 excessive force claim, then the Court should also grant summary judgment on Shekleton's state law assault and battery claim because Iowa applies the same standard as federal law to excessive force/assault and battery claims. Conversely, Shekleton argues that if the Court denies summary judgment on the § 1983 excessive force claim, then the Court should also deny summary judgment on the state law assault and battery claim.

Iowa Code section 804.8 provides in pertinent part that:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

*Id.* In *Chelf v. Civil Service Commission of City of Davenport*, 515 N.W.2d 353, 355 (Iowa App. Ct. 1994), the Iowa Court of Appeals found that "the 'reasonableness' inquiry in Iowa Code Section 804.8 is an objective standard" grounded in *Graham v. Connor*, 490 U.S. 386 (1989), the foundational United States Supreme Court case which addresses the reasonableness applicable to excessive force cases under federal law. Because the Court, in sections *V.C.1* and *2* of this decision, determined that there is a genuine dispute as to whether Deputy Eichenberger's use of a taser against Shekleton constituted excessive force in violation of Shekleton's constitutional rights, and applying

25

the same standard to Shekleton's assault and battery claim, the Court finds that there is a genuine dispute as to whether Eichenberger's use of a taser against Shekleton constitutes assault and battery (excessive force) in violation of Iowa Code section 804.8. *See Chelf*, 515 N.W.2d at 355. Accordingly, Defendants' motion for summary judgment on Shekleton's assault and battery claim is denied.

### 2. *Respondeat Superior*

In their brief, Defendants do not assert separate arguments on Shekleton's assault and battery claim and respondeat superior claim. Instead, Defendants merely address the assault and battery issue, and conclude that "[i]f this Court has determined that Eichenberger's single Taser deployment on Shekleton is objectively reasonable, thus defeating Plaintiff's claim that force was Constitutionally excessive, or that a reasonable officer could have believed that level of force circumstantially required for qualified immunity purposes, then either of those determinations would likewise eliminate Plaintiff's State law claims."[22] Defendants' contention is based on the assumption that the Court would find that they were entitled to summary judgment on Shekleton's § 1983 excessive force claim, which it has not. Defendants offer no authority or additional argument with regard to Shekleton's respondeat superior claim.

In his resistance, Shekleton argues that "the respondeat superior claim should survive summary judgment if this Court denies summary judgment on either of the corresponding Section 1983 claims" because under a claim of respondeat superior, an employer is liable for the negligence of an employee while the employee is acting within the scope of his employment.[23] In their reply, Defendants do not address Shekleton's argument on his respondeat superior claim, nor provide any authority on the respondeat

---

[22] *See* Defendants' Memorandum in Support of Motion for Summary Judgment (docket number 13-5) at 35-36.

[23] *See* Shekleton's Memorandum of Authorities in Support of Plaintiff's Resistance to Defendants' Motion for Summary Judgment (docket number 29-4) at 35-36.

superior issue. Failure to brief an issue in more than a "perfunctory manner," allows a court to consider the issue waived. *Ramirez v. Debs-Elias*, 407 F.3d 444, 447 at n.3 (1st Cir. 2005) (cited with approval in *United States v. Johnson*, 403 F. Supp. 2d 721, 764 (N.D. Iowa 2005)). *See also* Local Rule 7.d (Requiring the movant to provide a brief containing "citations to the authorities upon which the moving party relies."); *Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim in his opening brief, it is waived."). By failing to provide any authority on this issue, the Court determines that Defendants have waived their argument that they are entitled summary judgment on Shekleton's respondeat superior claim.

Nevertheless, even though the Court finds that Defendants have waived their argument regarding entitlement to summary judgment on Shekleton's respondeat superior claim, the Court will address the merits of the claim. Under the doctrine of respondeat superior, "an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment." *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999) (citations omitted). Two elements are required for a claim of vicarious liability under the doctrine of respondeat superior: (1) proof of an employer-employee relationship, and (2) proof that the injury occurred within the scope of that employment. *Id.* (citing *Biddle v. Santori Memorial Hospital*, 518 N.W.2d 795, 797 (Iowa 1994)). An act is within the scope of employment "'where such act is necessary to accomplish the purpose of the employment and is intended for such purpose.'" *Godar*, 588 N.W.2d at 705 (quotation omitted). The Iowa Supreme Court further explained that:

> The question, therefore, is whether the employee's conduct 'is so unlike that authorized that it is "substantially different."' Said another way, 'a deviation from the employer's business or interest to pursue the employee's own business or interest must be *substantial in nature* to relieve the employer from liability.'

*Id.* at 706 (quotations omitted).

Here, the two elements required for a claim of respondeat superior are met: (1) Deputy Eichenberger was employed by Chickasaw County, and (2) Eichenberger was acting within the scope of his employment when he investigated the alleged argument between Shekleton and Rausch, and used his taser against Shekleton to place him under arrest. Because the Court found that there is a genuine dispute as to whether Eichenberger's use of a taser against Shekleton constitutes assault and battery in section *E.1* of this decision, and the two elements required for a claim of respondeat superior are met, the Court determines that there is a genuine dispute as to whether Chickasaw County is vicariously liable under the doctrine of respondeat superior for Eichenberger's use of a taser against Shekleton.[24] Accordingly, Defendants' motion for summary judgment on Shekleton's respondeat superior claim is denied.

## VI. SUMMARY

Viewing the evidence in the light most favorable to Shekleton, the Court concludes that Deputy Eichenberger is not entitled to summary dismissal of Plaintiff's excessive force claim pursuant to § 1983. It follows that Eichenberger is not entitled to summary judgment on Shekleton's state law assault and battery claim, and Chickasaw County is not entitled to summary judgment on the state claim of respondeat superior.

---

[24] The Court was unable to find an Iowa case dealing with a claim of respondeat superior against a governmental entity, for assault and battery by a law enforcement officer. However, there are cases from other states allowing respondeat superior claims against municipalities for assault and battery by law enforcement officers. *See Primeaux v. U.S.*, 181 F.3d 876, 881-82 (8th Cir. 1999) (providing that under South Dakota law, a city may be vicariously liable under the doctrine of respondeat superior, when on-duty police officer engages in assaultive conduct); *Rau v. Roberts*, 2010 WL 396223 at *3 (D. Minn. 2010) (providing that under Minnesota law, a city may be vicariously liable under the doctrine of respondeat superior, when on-duty police officer engages in assaultive conduct); *N.X. v. Cabrini Medical Center*, 280 A.D.2d 34, 55 (N.Y. 2001) (indicating that a municipality may be vicariously liable for an assault committed by a police officer).

The Court further concludes, however, that Defendant Chickasaw County is entitled to summary judgment on Shekleton's § 1983 "failure to train" claim. Accordingly, Count II of Plaintiff's Amended Complaint will be dismissed.

### VII. ORDER

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment (docket number 13) filed by Defendants is hereby **GRANTED** in part and **DENIED** in part, as follows: Defendants are entitled to summary judgment on Shekleton's § 1983 "failure to train" claim, directed at Chickasaw County. Count 2 of the Amended Complaint (docket number 23) is dismissed. Defendants are not entitled to summary judgment on Shekleton's claim of excessive force pursuant to § 1983, or his state law claims of assault and battery and respondeat superior.

DATED this 26th day of _____April_____, 2011.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA